**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
MICHAEL DISTEFANO and
NICOLE DISTEFANO,

                              Plaintiffs,                        **MEMORANDUM**
                                                               **AND ORDER**

              -against-                                    CV 11-2893 (PKC) (AKT)

LAW OFFICES OF BARBARA H. KATSOS,
PC, and BARBARA H. KATSOS,

                              Defendants.
------------------------------------------------------------------X

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

        This case arises from the ultimate deterioration of the attorney-client relationship between

the Plaintiffs and the Defendants here.  It began as an adversary proceeding in a Chapter 11

bankruptcy filed by Michael Distefano and Nicole Distefano ("Plaintiffs" or the "Distefanos")  in

the United States Bankruptcy Court for the Eastern District of New York.  The proceeding was

withdrawn from the Bankruptcy Court on August 23, 2010.  *See* Compl. [DE 1-4].  In the

Complaint, Plaintiffs assert claims for breach of contract, negligence/legal malpractice, and

breach of fiduciary duty/duty of care against Defendants Barabara H. Katsos and the Law Offices

of Barbara H. Katsos, PC ("Defendants" or "Katsos").  *Id*.

        During the February 17, 2012 Discovery Status Conference, counsel for the Defendants

advised the Court that Defendant Katsos discarded her computer at some point before this

litigation commenced.  *See* DE 13.  The Court directed Defendant Katsos to provide the Court

and Plaintiffs' counsel with an affidavit detailing the circumstances under which the computer

was discarded.  *Id*.  After receiving the affidavit, Plaintiffs filed a motion seeking sanctions for

spoliation.  *See* DE 31.  In adjudicating that motion, the Court determined that an evidentiary

hearing was necessary.  *See* Memorandum and Order [DE 48].  Having conducted the evidentiary

hearing, the Court now issues this decision which constitutes its findings as to the spoliation

issue as a result of the hearing testimony and the parties' motion papers.

## I.  BRIEF BACKGROUND FACTS

According to the Complaint, Michael Distefano and non-party Franco Treglia were

owners of SharpImage Enterprises LLC ("SharpImage").[1]  *Id*. ¶¶ 12.  SharpImage is the

franchisee of three Cold Stone Creamery, Inc. ("Cold Stone") ice cream parlors (the

"Franchises").  *Id*. ¶ 13.  In October of 2006, the Franchises began experiencing financial

difficulties due to an extended power blackout in July of 2006 and were having problems

meeting their obligations to their creditors.  *Id*. ¶ 15.  As a result, Michael Distefano sought legal

advice from Barbara Katsos and eventually retained her.  *Id*. ¶¶ 16-17.  Plaintiffs allege that

Katsos negligently and ineffectively advised the Distefanos to establish an irrevocable trust (the

"Distefano Trust") in order to protect Michael Distefano's personal assets from the creditors of

SharpImage.  *Id*. ¶ 11.  Plaintiffs further allege that Katsos' advice not to negotiate with Michael

Distefano's and SharpImage's creditors alienated one of the creditors, Telerent Leasing

Corporation ("Telerent"), causing Telerent to sue the Distefanos, SharpImage, and Treglia (the

"Telerent Lawsuit").  *Id*. ¶¶ 23-24.  As a result of Katsos' alleged negligent representation in the

Telerent Lawsuit, Plaintiffs claim to have incurred substantial losses which ultimately led to

Plaintiffs' filing for bankruptcy.  *Id*. ¶¶ 25-28.  Plaintiffs assert additional acts of professional

negligence, including (1) Katsos' representation of Franco Treglia without obtaining a waiver of

---

[1]    SharpImage is listed as a plaintiff in the Bankruptcy Court adversary proceeding, but is
not a plaintiff in the instant action withdrawn from the Bankruptcy Court.

conflict of interest from Plaintiffs, *id*. ¶¶ 29-36, (2) Katsos' failure to pursue an insurance claim on behalf of Plaintiffs for their losses resulting from the July 2006 power blackout, *id*. ¶¶ 37-39, and (3) Katsos' failure to take action to prevent Cold Stone from terminating the Franchises, *id*. ¶¶ 40-48.

## II.    PROCEDURAL SETTING

### A.    The Previous Motion For Spoliation Sanctions

This Court issued a Memorandum and Order on March 29, 2013 addressing Plaintiffs' motion for sanctions against the Defendants, brought pursuant to Rule 37 of the Federal Rules of Civil Procedure, for alleged spoliation of evidence. *See DiStefano v. Law Office of Barbara H. Katsos, PC*, No. CV 11-2893, 2013 WL 1339548 (E.D.N.Y. Mar. 29, 2013). At that time, the Court temporarily denied the motion, without prejudice, pending a hearing. *DiStefano,* 2013 WL 1339548, at *9.

In the Memorandum and Order, the Court pointed out that the central issue raised in Plaintiffs' motion was Defendant Katsos' destruction of and/or failure to preserve electronic discovery. *Id.* at *3. Applying the now benchmark three-part test set forth in *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-112 (2d Cir. 2001), the Court first concluded that Defendant Katsos' duty to preserve documents and information arose at least as early as February 2009 "when Michael DiStefano terminated the attorney-client relationship between Plaintiffs and Defendants" in his letter dated February 24, 2009. *Id.* at *5. The Court further noted that Plaintiffs had purportedly questioned the legality of trusts created by Attorney Katsos on behalf of the Plaintiffs in the Summer of 2008. *Id.*

As to the second prong of the *Byrnie* test ("culpable state of mind"), this Court held that "other factual matters require consideration and clarification and . . . a hearing is necessary to explore the circumstances under which the alleged spoliation occurred."  *Id*. at *8 (citing *F.D.I.C. v. Malik*, 2012 WL 1019978, at *1 n.1 (E.D.N.Y.  Mar. 26, 2012)) (scheduling hearing to determine attorney's culpability).   In directing that a hearing proceed, the Court instructed Defendant Katsos to be prepared to testify, among other things, on the following topics:

1.  Katsos' normal document preservation/retention/deletion/destruction practices;

2.  the number of computers utilized in Katsos' law office prior to 2009, when the computers were purchased, and the specific circumstances surrounding the breakdown of each of those computers;

3.  the service agreements for those computers and the vendor(s) used;

4.  whether Katsos maintained a network server;

5.  AOL's automatic deletion policies to the extent they were explained to Katsos;

6.  a complete list of every email address used by Defendant Law Offices of Barbara H. Katsos, PC and Defendant Barbara Katsos or her staff to communicate with Plaintiffs;

7.  Katsos' attempts to gain access to the email accounts used by her paralegals and interns referenced in Paragraph 5 of Katsos Aff. II and page 16 of Plaintiffs' Memorandum;

8.  the document preservation steps undertaken by Katsos when Plaintiffs instituted an adversary proceeding against her in March of 2010;

9.  the retention and utilization of the services of Jan Sloboda.

*Id*.  To the extent that Defendant Katsos took the position that she would be unable to testify as to all of these topics, she was directed to bring to the hearing another individual or individuals from her office who could answer the questions regarding these topics.  *Id*.  The Defendants

4

were directed to prepare a subpoena, to be "so ordered" by the Court directing non-party Jan

Sloboda to appear at the hearing.  *Id*. at \*10.

 With regard to the third prong of the *Byrnie* test – that the destroyed evidence was

"relevant" to the party's claim or defense – the Court pointed out that "[b]ecause the state of

mind of the alleged spoliator determines what standard is necessary to prove relevance," *id.* at \*9,

a hearing was necessary.  At that juncture, the Court found that Plaintiffs had not established the

relevance of the destroyed material, but ruled that Plaintiffs would be given the opportunity to

question Defendant Katsos at the hearing regarding this third prong of the spoliation test.  *Id.*

### B.      **Which Version of Rule 37(e) Applies to this Motion?**

Before assessing the testimony presented at the Evidentiary Hearing, the Court needs to

resolve the issue of which version of Rule 37(e) applies in this case.   The Court points out that

when the amendments to the Federal Rules of Civil Procedure concerning discovery became

effective on December 1, 2015, some of the most significant changes took place in the Rule

governing sanctions related to spoliation.[2]   *See Cat3, LLC v. Black Lineage, Inc*., 164 F. Supp.

3d 488, 445 (S.D.N.Y. 2016).  In particular, amended Rule 37(e) is much more comprehensive

than the previous "safe harbor provision that protected against the imposition of sanctions where

ESI was lost as the result of routine computer functions such as automatic deletion." *Id.*   United

---

[2]      Prior to the 2015 Amendments, Rule 37(e) stated that "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good faith operation of an electronic information system." The Advisory Committee notes make clear, however, that "[w]hen a party is under a duty to preserve information because of pending or reasonably anticipated litigation, intervention in the routine operation of an information system" is required. Advisory Committee Note to the 2006 Amendment to Federal Rule of Civil Procedure Rule 37(e).

States Magistrate Judge Jay Francis, who has been frequently cited on ESI issues and spoliation, provided a comprehensive and instructive discussion of the Rule change in the *Cat3* decision which this Court finds useful in evaluating which version of the Rule should apply in the instant case.[3]   In pertinent part, Judge Francis parsed the changes as follows.

> [The amended rule] was adopted to address concerns that parties were incurring burden and expense as a result of overpreserving data, which they did because they feared severe spoliation sanctions, especially since federal circuits had developed varying standards for penalizing the loss of evidence. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. While some circuits had required a showing of willfulness or bad faith before a court could dismiss a case, enter judgment by default, or utilize an adverse inference, the Second Circuit permitted such sanctions upon a finding that the party that had lost or destroyed evidence had acted negligently. *Residential Funding Corp. v. DeGeorge Capital Corp.*, 306 F.3d 99, 108 (2d Cir.2002). The Rules Advisory Committee explicitly

---

[3]      Amended Rule 37(e) states that

> If electronically stored information which should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1)  upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> (A) presume that the lost information was unfavorable to the party;
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> (C) dismiss the action or enter a default judgment.

rejected the *Residential Funding* standard, Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment, and instead adopted the principle that severe sanctions are only permitted where the court finds an "intent to deprive another party of the information's use in the litigation," Fed. R. Civ. P. 37(e)(2).

In addressing whether the amendment to Rule 37(e) is to be applied retroactively, Judge Francis noted:

> In transmitting the proposed rules amendments to Congress on April 29, 2015, Chief Justice John G. Roberts included an order providing in part that "the foregoing amendments to the Federal Rules of Civil Procedure shall take effect on December 1, 2015, and shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending." 2015 US Order 0017. This order is consistent with the relevant statutory provision, which states in part:
>
>> The Supreme Court may fix the extent to which such rule [of procedure or evidence] shall apply to proceedings then pending, except that the Supreme Court shall not require the application of such rule to further proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies.
>
> 28 U.S.C. § 2074(a). The issue, here, then, is whether to apply the new version of Rule 37(e).
>
> The new rule places no greater substantive obligation on the party preserving ESI. Rather, "Rule 37(e) does not purport to create a duty to preserve. The new rule takes the duty as it is established by case law, which uniformly holds that a duty to preserve information arises when litigation is reasonably anticipated." Report of Advisory Committee on Civil Rules, App. B-15 (Sept. 2014), available at http://www.uscourts.gov/uscourts/RulesandPolicies/rules/Reports/ST09-2014.pdf. This suggests that, since the amendment does not establish a new rule of conduct, either version of the rule could apply.
>
> However, both the Supreme Court's order and the governing statute create a presumption that a new rule governs pending proceedings unless its application would be unjust or impracticable. 2015 US Order 0017; 28 U.S.C. § 2074(a). Here, because the amendment is in some respects more lenient as to the sanctions that can be imposed for violation of the preservation obligation, there is no

inequity in applying it [citation omitted]. *Cf. Ultra–Temp Corp. v. Advanced Vacuum Systems, Inc.*, 194 F.R.D. 378, 381 (D.Mass.2000) (holding that, while conduct of litigant should be judged by Rule 11 in effect when conduct occurred, sanctions should be governed by amended rule, which made them discretionary rather than mandatory).

*Cat3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d at 495-96.  Finding that there would be no inequity in the specific circumstances set forth in *Cat3*, Judge Francis chose to do to consider the defendants' spoliation motion under the amended version of Rule 37(e).

Courts within this Circuit have applied the amended version of Rule 37(e) on a case-by-case basis.  *See Citibank, N.A. v. Super Sayin' Publishing, LLC*, 14-CV-5841, 2017 WL 946348, at *2 (S.D.N.Y.  Mar. 1, 2017) (notwithstanding plaintiff's argument that application of new Rule 37(e) was not just and practicable, court applied new Rule finding that plaintiff made the motion more than nine months after the new Rule took effect and cited the current version as the only rule to be applied); *Best Payphones, Inc. v. City of New York*, 1-CV-3924, 2016 WL 792396, at *5 (E.D.N.Y. Feb. 26, 2016) (applying amended Rule 37(e) and noting that "as to the emails . . . at the time in issue, preservation standards and practices for email retention were in flux").  Other courts have chosen to apply the Rule as it existed prior to the 2015 Amendments.  *See Hadiyah v. City of New York*, 12-CV-6180, 2017 WL 530460, at *26-*27 (E.D.N.Y.  Feb. 7, 2017) (applying the three-part *Byrnie* test to find plaintiff negligent in losing her cell phone containing a video of the underlying incident but denying adverse inference instruction);  *Learning Care Group, Inc. v. Armetta*, 315 F.R.D. 433, 440 (D. Conn. 2016) (court disagreed with plaintiff's argument that new Rule applied and that negligence in destruction of a laptop was not a sufficiently culpable state of mind to warrant sanctions, finding that applying the new rules would be neither just nor practicable "because the parties first raised this issue in September 2015, prior to the application

of the new rules"); *Thomas v. Butkiewicus*, No. 3:13-cv-747, 2016 WL 1718368, at*7 (D. Conn. Apr. 29, 2016) (finding that "it would be unjust to utilize the new Rule 37(e) in this proceeding," and deciding instead to "apply the traditional standard for assessing the need for spoliation sanctions in this case" where the action "was filed more than two-and–a-half years before the change to Rule 37(e) took effect"). This Court finds that applying current Rule 37(e) is not "just and practicable" in the specific circumstances of this case because (1) the parties briefed this motion under former Rule 37; (2) the Evidentiary Hearing was conducted under the tenets of former Rule 37; and (3) the conduct relevant to the motion began more than seven years before the current version of Rule 37(e) took effect. Therefore, the Court will proceed to examine Defendant Katsos' conduct under the version of Rule 37 in effect prior to the 2015 Amendments.

## III. THE EVIDENTIARY HEARING

### A. Preliminary Considerations

The first prong of the *Byrnie* test as applied to these circumstances of this case was discussed in the previous Memorandum and Order. *See* DE 48 at 4, 6-13. The first element a party must show when seeking sanctions for the destruction of evidence is "that the party having Control over the evidence had an obligation to preserve it at the time it was destroyed." *Chin v. Port Auth. of New York and New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012). The Court here determined that Defendant Katsos had a duty to preserve documents and materials and that such duty arose as early as late February 2009, "when Michael DiStefano terminated the attorney-client relationship between Plaintiffs and Defendants." DE 48 at 8. The termination of Katsos' services occurred prior to the alleged destruction of the documents at issue here. *Id*. at 11. In the specific circumstances of this case, then, the Court held in its March 29, 2013 Memorandum and

Order that Defendant Katsos had a duty to preserve the materials at issue in this motion at the time those materials were destroyed.

Having already found that Defendant Katsos had a duty to preserve the materials, the Court now focuses on the two remaining prongs of the *Byrnie* test, namely, the "culpable state of mind" factor and the "relevance" of the destroyed evidence to the claims and/or defenses in the case. Because the state of mind of the alleged spoliaor determines what standard is necessary to prove relevance, the Court directed that an evidentiary proceeding be held in order to make this determination.

**B.      The Testimony of Barbara Katsos**

Barbara Katsos testified that she became licensed as an attorney in June 1997. *See* Transcript of the June 4, 2013 Evidentiary Hearing at 5.[4]  As to her educational background, Katsos received a Bachelor of Science degree in Education and then went on to complete a Master's degree in Special Education and a Ph.D. in Educational Administration. Tr. 5.  She had taught every grade level from nursery school to eighth grade and was responsible for setting up the Cathedral School in New York City, the "flagship school of the Greek Archdiocese" in Manhattan. Tr. 5-6.  From1987 to 1993, Katsos served as the principal of the Cathedral School. Tr. 6.

In 1993, Katsos began studies at CUNY Law School and ultimately received her J.D. in 1996. Tr. 7.  She was admitted to the Bar of New York State in 1997.  *Id.*  While in law school, Katsos served as an intern in the law office of Theodore Prounis, the President of the Board of

---

[4]      All subsequent references to the hearing testimony on June 4, 2013 are designated
Tr. __."

Trustees of the Cathedral School, whose law practice encompassed trusts and estates and business law.  Tr. 7-8.  Upon graduation from law school in 1997, Katsos set up her own firm.  Tr. 8.

Katsos testified that up until 1997, she had not received any formal training in computers. Tr. 9.  When she started up her practice, she primarily handled landlord/tenant matters and simple wills.  Tr. 9.  She continued to practice in the same location – in the suite of offices where Mr. Prounis worked – up through 2008, the time frame of the incidents giving rise to the instant Complaint.  Tr. 10.  In 2008, Katsos had a staff consisting of an office manager and a law student intern.  *Id.*  The intern eventually received her J.D. and then worked as a paralegal for Katsos while she took the Bar exam   Unfortunately, this individual, Jesika Thompson, passed away before being sworn in as an attorney.  Tr. 11.  During the summers, Katsos had interns from Marymount and NYU working in the office.  Tr. 12.

When asked about her office's document retention, deletion and destruction practices in 2009, Katsos testified that "everything was made in hard copy."  *Id.*  She further stated "[b]asically that's what I had learned to do was that – make copies of everything.  We were very meticulous.  We had close to 100 file cabinets, and about 400 boxes in storage, and we kept every – every piece of paper was made into a hard copy and it was preserved . . . in file cabinets."  *Id.* As to document storage, Katsos testified as follows:

> Q.      And it would be –
>
> A.      – in file cabinets.
>
> Q.      – Would it be put in a file relating to the client matter?
>
> A.      Yeah, there were subject matters.  Each client would have a subject matter, depending on the amount of work of that client. If it was a small will, obviously it would be in a smaller file. A larger amount of work went into

11

redwells, and they were categorized and put in file cabinets in the file room.

Q.     All right, and to your knowledge, were those policies followed with respect to the matters the firm was handling with respect to Mr. Michael DiStefano and Nicole DiStefano?

A.     Yes, yeah.

Tr. 12-13.

According to Katsos, she produced approximately 10,000 pages of documents in the discovery process relating to the DiStefano litigation. Tr. 13. In 2009, there were five computers in the office – one for Mr. Prounis, one for the paralegal, one for the office manager, one for the interns, and one for Katsos herself. *Id.* Katsos did not know whether the five computers were connected to a network server, but was told that there was no server. Tr. 14. Any information regarding matters being handled for Edward DiStefano were stored on Barbara Katos' own computer in her office. *Id.* That computer also contained information pertaining to other clients' matters which Barbara Katsos was handling. *Id.* As to the management of client information, Katsos testified as follows:

Q.     All right, and would the computer in your office also hold the information pertaining to other client matters that you were handling?

A.     Yeah.

Q.     All right, and would other – would Mr. DiStefano's matter, or for that matter, other client matters, be stored on other computers in the office, to your knowledge?

A.     Not really.     Anything that was substantive – my computer was the computer, sort of like the brains of the operation, that had everything on it, in my – in my office.

Q. All right. Now you mentioned that the office manager had a computer in her office.

A. Right.

Q. What was on the office manager's computer?

A. Besides Solitaire, unfortunately, my office manager was not very computer literate, so the only thing that she would really have would be how to order things, she would order the office supplies. She's an older woman and it's fine, and I hired her knowing she was not computer literate, which was great, because she's wonderful in many other ways. But computer literate she is not. So we've taught her a little bit more, but she would order supplies on her computer, and, you know, she could not – she does not have the ability to write letters and type.

Q. All right, so is it accurate to say that client-related matters were not –

A. Oh, no.

Q. – on that computer?

A. No.

Q. Okay.

A. There were not any.

Tr. 14-15.

According to Defendant Katsos, the computer the paralegals used was physically located in a separate office. Tr. 15-16. That computer stored transmittal letters, essentially cover letters used when sending documents to a client. Tr. 16. The cover letter would be mailed out but the document itself would remain on the computer. Tr. 17. Mr. Prounis had his computer in his own office with him. Tr. 19. Katsos testified that the materials on Prounis' computer consisted of Turbo Tax and tax materials since he did taxes for clients. *Id.* The interns were permitted to use the computer in the file room for projects assigned by Katsos or someone else in the office. and

they were able to access the internet from the file room computer.   Tr. 20.

Katsos also testified that from the time she left the Cathedral School up until 2009, she never took a course in computers or any CLE courses in computer management.  *Id.*  She did not know the brand name of the computers in her office nor the operating system used in each one Tr. 21.  Katsos retained outside help from an individual named Jan Sloboda.  *Id.*  She had obtained Sloboda's name from a teacher at the Cathedral School when she left to set up her own practice.  After interviewing Sloboda, Katsos retained him and "he was with me from around" 1998 until 2009, at which point she lost track of him.  Tr. 22.

Katsos never had any formal written contract with Sloboda.  Tr. 23.  When she called him with a problem, he came and fixed it.  She paid him in cash, and on a few occasions, she did some personal legal work for him, as a "quid pro quo."  *Id.*   Katsos stated that even as she was then testifying, she was not computer savvy.

 In 2009, Katsos and her staff were using email in the office to a limited degree.  Tr. 24. They utilized the email address "bhkesq@aol.com."  *Id*.   As to saving any emails, Katsos stated that "if the email was a substantive one, I would print it, so . . .  For the most part for myself so I could remember what I had written.   Because finding it was always a problem, and I knew that if I needed to refer to it and it was substantive, I needed to print it."  Tr. 25.   Once the email was printed, it would be placed in the file.   In 2008 - 2009, because the office was using AOL, each person working there had a separate AOL account, including the paralegal, Prounis and Katsos herself.  Tr. 26.   Katsos confirmed the three separate email addresses being used.   She also identified a fourth email address which she believed was set up for the interns' use so that they were not using their NYU email addresses.  Tr. 28.   According to Katsos, she had no control over

any of the email accounts except her own and she did not know any of the passwords.  *Id.*
Paralegal Chris McCarthy (who succeeded Jesika Thompson) did not like AOL and set up another
email address, katsoslaw.com, using Microsoft Outlook.  Tr. 29.  Katsos testified that she was
never able to access anything from that address and never used it.  Tr. 30.  She had no personal
knowledge about how to set up or purchase a domain name to register a law firm.  *Id.*

In connection with the spoliation motion, Katsos' attorney, Paul Callan, had requested
that she go back and attempt to access the email accounts of paralegals who had worked for her in
the past.  She was not successful because she did not know the passwords, did not know the
answers to the security questions and was blocked out.  Tr. 31.  When she contacted AOL for the
very first time – after this litigation had been commenced – Katsos was advised that AOL does not
retain emails unless the user basically does something to retain them.  Katsos learned that
retained emails were kept by AOL for 27 days only.  Tr. 32.  She confirmed that she had never
instituted any mechanism to save AOL emails on her own local computer, as opposed to on the
AOL network.  According to Katsos,

> A.    I never thought that I had to, no, I didn't.
>
> Q.    Well, did you know how to do it?
>
> A.    You know, I just –   know. I mean, I didn't realize that saving was an
>        issue, that it was –   you know, and I didn't know how to do it anyway.
>
> Q.    Well, what did you think happened to emails?
>
> A.    I don't know.   I thought that everything was – should be there.   I didn't
>        realize that everything was not there.   I mean, I – you know.   Because
>        when I would go down, let's say the next day, I would see it the next day,
>        so I assumed it didn't go anywhere, because I didn't get rid of it.   So I
>        would assume that it would be there.

Q. Now when you say it, are you talking about –

A. Anything, you know.

Q. Are you talking about looking at your inbox?   When you open AOL and you look at your inbox –

A. I looked at whatever is on the screen.

*   *   *

Q. But it is –   But it is your testimony that you have made copies of any emails that were of substance with respect –

A. Yeah.

Q. – to Mr. DiStefano's matter?

A. When it was of substance and I wanted to remember what I had said, I would print it right away.

Q. And that would be in the file?

A. And that would be in the file, yeah.

Tr. 33-34.

Katsos testified that she was not aware of any method to set up automatic deletion of emails from the email account nor was she aware of how emails might be saved or deleted from a "sent file" or "sent folder."  Tr. 34.   She never took a class in AOL nor did she read anything about the inner workings of AOL email.  Tr. 34-35.

As to the difficulty with the operation of her office computer system in 2009, Katsos stated that she went into the office one day and there was a blue screen on her computer.  Tr. 36. She called Jan Sloboda and told him and he responded "about something called blue screen death, which did not make me happy."  *Id.*  Sloboda came to the office, examined the computer, and told

her that it was "bad and that nothing could be recovered." Tr. 37. He added that her computer was "gone" and "fried." *Id.* In checking the other computers in the office, Sloboda told her that those computers "went out" and that he would try to see what he could do to recover as much as he could. *Id*. Sloboda believed it was a virus because of the way it had spread. Katsos does not know if Sloboda ever found the cause of the problem. Tr. 38. According to Katsos, Sloboda told her that the least expensive way to address the problem was to "let him change the components." Tr. 39. They did not buy new units, but rather changed the components. *Id.* Katsos did not have any service agreements for the computers with any other vendors, nor did she have any financial records from Sloboda relating to the purchase of those computers. *Id.* She denied ever intentionally destroying documents related to Plaintiff DiStefano's lawsuit. *Id.*

When questioned about office management, Katsos testified that in 2008 and 2009, her office did not have a case management software system on any of the computers in the office. Tr. 41. Katsos organized information on her computer using WORD. *Id.* As she described it, "I would break down the folders into alphabetical order in the Word system, and I would put from A to Z folders. And as – whatever the client's name was, I would keep it in their in alphabetical order so it would be easy for me to find." *Id*. She did the same thing with billing records, namely, print them out. *Id.*

On cross-examination, Katsos was asked about her document retention policies in 2006 when she began her representation of Plaintiff Edward DiStefano. Katsos testified that there were five computers in the office in 2006, but she was not sure if they were the same ones which were there in 2008. Tr. 44. When Jan Sloboda came in to fix problems, he may have removed the hard drive, but she was uncertain. *Id*. All she knew was that after Sloboda left, the computer

worked.  *Id.*  She had a "sneaking suspicion" that the interns were downloading things they`

probably should not have been downloading when they were there in the summers.  Tr. 45.

When asked about the specific kinds of issues she had with the computers, Katsos responded that

the "computer wouldn't work.  It wouldn't start.  It was dragging.  It wasn't giving us responses.

. . .  Mine and a lot of the others."  Tr. 45-46.

Katsos re-confirmed that she paid Sloboda in cash or kind and may have cut two checks to

him over a period of ten years.  Tr. 47.  She did not keep a record of cash expenses for servicing

the computer and did not record those expenses for tax purposes.  Tr. 47-48.  When asked if there

were any documents which would show when in time Jan Sloboda did the various repairs or

switchings of the main computer or the other computers in 2006-2007, Katsos responded "no."

Tr. 48.  She described her conversation with Sloboda in 2008 about re-setting the computer

system:

> Q.  When you discussed setting up the computer system for the Law Offices
> of Barbara Katsos and for yourself, did you give him direction as to the
> system requirements, the things you needed?
>
> A.  In what way, other than that I needed a computer – five computers to be
> set up?
>
> Q.  Did you ever explain to him that these were client records and these were
> documents that needed to be protected or kept protected from deletion?
>
> A.  I said to him, these are, you know, well, these – we need to have these in
> the – these are lawyer's files, and I think he – I'm assuming he understood
> that, that they were lawyer's files and they were client files.   He didn't
> assume that they were anything else, and that these were confidential files
> that we were responsible for, yeah.
>
> Q.  Did you ever ask him to set up a backup for the computer files, any of
> them?

A.    I didn't discuss it with him because I normally thought that he would do it. Whatever he needed to do to set it up, because it was a lawyer's office, and that he knew how to do that, and therefore, he would do it . . .

Tr. 50.

With regard to the specific domain name for the Law Offices of Barbara Katsos which was set up by Chris McCarthy, Katsos testified that McCarthy did not discuss with her beforehand what he was doing. Tr. 51. According to Katsos, that was one of the reasons for McCarthy's termination. *Id*. She knew that McCarthy did not like AOL, but McCarthy never mentioned any preservation issue as the reason he switched to Microsoft Outlook. Tr. 51-52. Katsos acknowledged that she asked Mr. Prounis questions regarding Edward DiStefano and/or Franco Treglia, but never by email. Tr. 53. Prounis did DiStefano's tax work, including tax work on any trust. *Id.*

Plaintiffs' counsel showed Defendant Katsos a three-page email chain which was eventually admitted as Plaintiffs' Exhibit ("PX") 1 [Distefano 1643-45]. The exhibit contains two emails, both dated March 28, 2008, the earliest one ending with "Regards, Barbara." That email was directed to Clay Hodges, Esq., local counsel for Katsos in the *Telerent* matter which was pending in North Carolina, with a copy to Melisa Daigneault, Esq., opposing counsel from the Parker Poe firm in North Carolina. The second email was sent some 42 minutes later from Attorney Daigneault to Attorney Hodges and Attorney Katsos. *See* PX 1 [March 28, 2008 emails]. The two emails contain discussions between Katsos and Daigneault regarding Daigneault's complaint that she had not received responses to discovery demands served on Katsos. The email address appearing for Attorney Katsos is "Tpassoc@aol.com." *Id.* When asked about the exhibit, Katsos responded as follows:

Q. Now, do you see on the third page –

A. Yeah, and I'm familiar with it, yeah, absolutely. Many times what would happen is, I wasn't in the office, and I would speak on the phone to Mr. Prounis, and something had to get out, and he would type it up and send it from his e-mail. I was discussing it with him, and I gave him permission to write my name on it, because it had to get out, and I didn't have access to a computer. I'm looking at the March 28th, 2008. I was probably not in the office at that time and I was discussing it with Mr. Prounis, and something had to get out to Clay, and I discussed it with Mr. Prounis and had him send it out. He would not go in and send it out from my e-mail. He would send it from his, yeah. That's correct.

Q. So, the "regards Barbara" even though it says that, it is Ted Prounis who wrote this?

A. With my permission, yeah.

\*   \*   \*

Q. Did you often use Ted Prounis' e-mail account to send e-mails in Mr. DiStefano's case?

A. Well. I didn't use it. I mean, if Mr. Prounis and I were discussing it and I was not there and something had to be taken care of, it's like any other paralegal would be able to do that. He would do that. He was in the office all the time. . . .

Q. You did not produce this document in your production, did you?

A. I – if it was there, it was produced. If it's not there, then it was not produced.

Tr. 56-57.

Katsos acknowledged that her retention policy was to look at a document and decide whether it was relevant, and then print it out if it was. Tr. 58. As to emails received from Edward DiStefano, Katsos testified as follows:

Q. When Mr. DiStefano's matter was over, when he fired you – or terminated the services in February of 2009, what did you do with respect to his e-mails?

A. Nothing.

Q. Nothing?

A. I – nothing. I mean, I didn't do anything with them. What was I supposed to do with them?

Q. Did you go online to AOL and select any documents to print out?

A. No, because any documents that I would have printed out, I would have printed out already, and 2009, when I was having the computer issue, so I wouldn't have been able to do anything anyway.

Tr. 58-59. Katsos confirmed that at the time Plaintiff DiStefano terminated her services, she had copies of any email she previously had printed, but she did not download any of the emails regarding any DiStefano matters which were then in the computer. Tr. 59. She turned over anything that had been previously printed and whatever else was in the paper file. Tr. 60. According to Katsos, "any e-mails that we deemed relevant or in the course of any kind of representation, would be printed out and would be in the files. So there was no reason to do anything other than that in our office." Tr. 63.

The Katsos firm did not generate time records on the computer. Tr. 64. Those records were written down and reviewed with the respective clients when the firm was completing flat-rate work, such as a will. *Id*. Katsos testified that she did not have written records of the date and time that things were done for the clients. Tr. 65. Litigated cases were a little different. In those matters, the firm had a monthly retainer and itemized bills for which the clients were expected to make monthly payments. *Id*. Katsos confirmed that the litigation bills probably contained time

entries of what was done during a particular month. Those bills were mailed to clients. She believed that DiStefano's bills were mailed to him, not emailed to him. *Id*. The policy was to make a photocopy of the bill, put it in the file, and then send out the bill in the mail. Tr. 66.

Plaintiffs' counsel then introduced nine pages of "Invoices" from the "Law Offices of Barbara H. Katsos, P.C.," addressed to "Mr. Franco Treglia" and "Mr. Michael Distefano" or "Eversharp Physical Therapy." *See* PX 2, CKBB 000941-950 [2007 Invoices]. All of the Invoices are for work done in 2007. When asked if she had more bills that she sent to DiStefano than these, Katsos responded that she could not remember. Tr. 68. She testified that she wrote the time to be billed on a yellow pad and "they" would type it up. That information was typed onto the computer – either hers or the paralegal's – and was then printed. Tr. 70.

Defendant Katsos was shown, among other things, a series of 2007 emails apparently sent by Jesika Thompson, Katsos' paralegal, transmitting monthly billing statements to Michael DiStefano (and sometimes Franco Treglia) for work done on behalf of SharpImage Enterprises LLC. *See* PX 3 [Thompson Emails]. Katsos confirmed that Jesika Thompson was forwarding these monthly billing statements to the Plaintiff by email, although some bills were mailed. Tr. 74. Likewise, Katsos was shown a series of 2008 emails sent by "Jason K. Ciarlante, Paralegal/Legal Support Staff, Law Offices of Barbara H. Katsos, P.C." similarly transitting monthly invoices to Michael DiStefano, including a "Final Invoice" dated February 2009. *See* PX 4 [Ciarlante Emails]. Katsos confirmed that Jason Ciarlante continued the procedure followed by Jesika Thompson as to the sending of the billing statements by email. TR 76. After being directed to an entry designated "XLS" on one of the emails, Katsos did not know if Microsoft Excel was used with respect to the firm's billing practices. Tr. 76-77.

The Court then permitted the testimony of non-party witness Jan Sloboda to proceed out of time. Once Mr. Sloboda finished testifying, Defendant Katsos returned to the witness stand.

Katsos testified that the first time she searched her AOL email account in connection with this litigation was when the Complaint was served and her attorneys asked her to do so. Tr. 124-125. With regard to the preservation issue, Katsos responded as follows:

> Q. Did you ever initiate some form of litigation hold?
>
> A. Of what?
>
> Q. Litigation hold, are you familiar with the term, of a litigation hold?
>
> A. No. I'm not familiar with the term.
>
> Q. Okay. Did you, upon finding out that there was an adversary proceeding that had been filed against you, take any affirmative steps to save information?
>
> A. I did not believe that I – there was anything to save. Everything I had, I had. I never believed that there was anything that I didn't have, that there was something to save, and I couldn't get anything from the computers after a certain point. So I knew that there was nothing there and anything that I would have had that was of importance was printed out and put in the file.

Tr. 125-126. When her attorneys asked her to do a search of her AOL account for relevant emails, Katsos stated "I was a little bit amazed that I couldn't pick up any more e-mails." Tr. 127. She never manually deleted emails, never moved them to any saved folder on the AOL account, and never forwarded them to any email address. Tr. 127-128. She printed them out and sent them to her attorneys. Tr. 128. She logged back into the AOL account in 2012 while discussing with one of her attorneys who walked her through the process of where she should look and she came up with a few more emails that she sent over to counsel. *Id*. These emails were in her "sent"

items folder, but there were no emails in her "inbox." Tr. 129. When she called AOL, the technician told her that AOL "had no ability to save e-mails past the 27 day mark unless . . . I had affirmatively done it." Tr. 129-130.

After being given a further explanation of what a litigation hold is, Katsos testified that she did implement a hold when she was "served with papers." Tr. 136. She emphasized that she never destroyed anything and the policy in her office was that they never destroyed anything. They kept files and she has files back to 1964. *Id.* When asked if she ever gave her paralegals or office manager an instruction to preserve any notes, correspondence and anything on the computer system related to this case, Katsos responded that "there was no way that they would destroy anything without talking to me first." Tr. 137. After being told that the question was not about destroying anything, but rather whether she had given the staff a specific instruction to segregate all of the documents and information that may have been in the office concerning the DiStefano matter, Katsos answered that she told the staff to keep everything in boxes, to take any documents "from where they were physically, put them in boxes and them separate into the conference room so that they would not get lost or destroyed. . ." Tr. 138. She did not give them the same instruction for their computer accounts or their email addresses "because there was nothing to do on them." *Id.*

Katsos further testified that she did contact her former paralegal, Jason Ciarlante, in 2010 to inform him that Mr. Prounis had passed away. Tr. 140. However, she did not tell him at that time that he needed to preserve any information relating to the DiStefano matter. *Id.* As to Jesika Thompson who had passed away, Katsos did not take steps to try to obtain or protect Thompson's emails because Katsos did not have the password and could not access them. *Id.* In

retrospect, Katsos was concerned that she did not have the staff passwords at the time and stated she now has a different practice in place.  Tr. 141.

With regard to her knowledge of computers, Katsos testified that she never took any CLE classes to try to expand her knowledge of this area because she was "introduced to lawyering as lawyering" and "spent a lot of time with issues, with client issues, and trying to resolve client problems."  *Id.*  At the time, she considered the computer a "tool," it was "a way to write documents quickly, and if it doesn't work, we call somebody and they fix it.  And that's – it wasn't in my scope of what I felt I needed to do, and obviously that's not correct. . .  I did not get that involved in it."  Tr. 142.  As to Franco Treglia, Katsos testified that she may have emailed him in the period between 2006 and 2010 and her paralegals may have emailed him.  Tr. 143.  She did not pursue trying to recover any emails to Treglia because of the same issue, namely, that she did not have the password and was blocked out.  Tr. 144.

At the time she was experiencing computer problems in the office and was working with Jan Sloboda, Katsos confirmed that she never discussed with him backing up the data on the office computers because she "assumed that that's what they did . . . they being computer IT people."  Tr. 145.  She further assumed that Sloboda would give her a recommendation if needed.  *Id*.  She selected Sloboda to do the work based on a recommendation from someone she had worked with at the Cathedral School.  Tr. 145.  He was willing to come at any time she needed him and that was key for her."  Tr. 145-146.  She did not look into any of his credentials or background based on the recommendation she had received.  Tr. 146.

Katsos confirmed that she was aware in 2011, when the document requests were served in this case, that one of the specific instructions in those demands required her to identify any lost or

destroyed documents.  Tr. 149.  She stated that she did not know of any lost or destroyed documents.  Tr. 150.  As to the AOL email account, Katsos responded ". . . how would I know what those emails were if they weren't printed out.  And unless they were substantive, they wouldn't have been printed out.  If they were substantive, they were printed out."  *Id.*

### C. Jan Sloboda Testimony

The first time Jan Sloboda began working with computers was in 1981 when he found a job in the School of Medicine at the University of Nevada.  Tr. 83.   He pointed out that the IBM PC was a new device at that time.  *Id.*  He returned to New York City at the end of 1983 and started working at Walsh Greenwood Information Systems, a subsidiary of Wang Information Systems, and later for Wang itself.  Tr. 85.  He worked as a senior programmer on the PC development for front end terminals and stayed with Wang until 1986.  *Id.*  He left at that time to try something on his own*. Id.*  He eventually returned to Wang Laboratories and remained there until September 1994.  Id.  He then began freelancing as a computer advisor/consultant and spent most of his time doing repairs and "getting the computers to be operational."  Tr. 86.

Sloboda first went to the Katsos law office in 1997 or 1998 to deal with a problem with one of the PCs.  Tr. 84.  At that time, there were two personal computers in the office.  Tr. 87.  Each one had its own printer and they were running Windows 95.  *Id.*  Later, these two computers were replaced with more powerful computers which Sloboda selected and bought at computer trade events.  *Id.*  He would buy the components and then configure them into a system.  Tr. 88.  His business did not have a name, just his personal name.  *Id.*  According to Sloboda, he never issued an invoice for work that he had done and that he never had a contract with a customer.  Tr. 89.  He would discuss with the client whether it was a one time or single day operation and

would reach an agreement on how much the service would cost. *Id*.

Sloboda maintained and serviced the computers at the Law Offices of Barbara Katsos between 2006 and 2009. Tr. 90. Originally, the two computers in the office were not connected. Each one had a modem and the staff could dial in to the America Online service. Each computer had a printer and one had a scanner to scan in forms. *Id*. Sloboda testified that he never installed a network server at the Katsos office. Tr. 91. Three additional computers were eventually obtained, which Sloboda referred to as "a work group connection." *Id*. He noted that "with the advent of the broadband, it started to make sence because we run the router. We were able to connect all computers to the internet. . ." *Id*. A work group network could do the "file services," "database services," and would be able to set up the "network Oasis." *Id*. Sloboda stated that at the beginning, the office was using "very basis services," namely, the printers. Tr. 93. Later, the computer was able to open a browser and use the computer for internet research or something similar. *Id.*

In 2008-2009, Sloboda recalled that one of the major problems Katsos had "was with the viruses on the net – on the computers. . . . And there were situations when one individual computer was infecting the others." *Id*. When this first happened, Sloboda disconnected the computers individually. Tr. 94. The viruses were removed from each one and when they looked like they were clean, he reconnected them and they were operating again for some time. *Id*. According to Sloboda

> . . . and for whatever reason, the situation repeated again very much, few months later. And, I don't – I never got a full understanding why, but probably the reason is that it was not happening before so much, it was just sometimes it was happening when she had some of those young people – it – on – those interns. It's – it was happening more frequently. The complete failure of the computers what's

was not happening but they were slowing down very badly, and they were still working on it but I would be on there – but to use those computers you were able to have to have a patience. And, second time what happened – Ms. Katsos called me that her computer is malfunctioning and it had the blue screen or a black screen . . .

Id.

In terms of how he serviced the computers, Sloboda testified that he would first have to diagnose the problem. When there was a more serious problem, such as viruses, that could sometimes cause the hard disk to slow down and that disk had to be replaced "as quickly as possible." Tr. 96. Sloboda stated that "I had to make sure that the other hard disk is going to be discarded, but functionally completely destroyed." *Id*. There came a time when Sloboda had to replace all of the hard drives in the office because of the virus problem. *Id*. Attorney Katsos asked him to try to save the data that was on the computers. *Id*. According to Sloboda, it "was impossible to save any data." Tr. 97. Katsos' computer had "that blue screen or black screen of death." *Id*. When he pulled out the hard disk, he could not get any information out of it. Whole directories were missing. Sloboda used a utility disk to see if there was recoverable information on the disk but could not find any. *Id*. As to his conversation with Katsos about the situation, Sloboda testifed as follows:

Q. And did you tell Barbara Katsos that the data on her computer could not be recovered after you had done this exploration with the software that you've described?

A. Yes, I was showing that to her, and –

Q. And how did she react when you told her this?

A. She did not like it. She asked me what else I can do about it, and then I could not say anything. I was thinking just to ask if I can get some other software and I said that it looks like the worst-case scenario would be to go to the data recovery services, which are much better, but which are specialized in this kind of operation. However, it – one them would be the

28

Ontrack Corporation, which actually was a company salvaging the data from – or recovering the data with a faulty hardware or somehow destroyed file systems. However, this service is expensive and one of their own Ontrack software which they are offering, it was unable to get anything out of that disk. So, it would be a situation where you would send for the recovery of the drive. You would pay up front the amount, some large amount, and without any guarantee that you would get anything back. That would be the deal. And I saw that the data is not recoverable. That was my opinion.

*   *   *

Q.   And were you of the opinion that that could – that the –

A.   And the software was showing that it could not recover anything out of it, and that was there. Even if it would show it, I would be unable, with that software, to recover, the files from the system. I would have to send them to the recovery services.

Q.   And were you –

A.   They were available some other – some software which would do these things, but I tried – I cannot recall, I had it on the (indiscern.) B-E CD set and I did not get any results, again.

Q.   And did you ultimately advise her that it was your opinion that the data was not recoverable?

A.   That's correct.

Q.   And after you made this determination, what did you do with the hard drive that had been on Ms. Katsos' computer?

A.   It was destroyed.

Q.   What did you do with it physically?

A.   All these drives are in – I was destroying for years. The way that I vertically drilled hole through the platters, and preferably when I had the small holes done, then I was using the much blunter, wider drill which would drill the platters and at same time it would cause tremendous vibration in it that it would cause as bid damage to the platters as possible.

Q.    And you did that with respect to the hard drives?

A.    With every hard drive.  I never tossed away a hard drive which would not
      be destroyed, not in the past 20 years or before.

Q.    All right.  And did you replace the hard drive, then, with new hard drives?

A.    Yes, I did.

Tr. 99-100.

Sloboda testified that he did not do much more work for Katsos after that since Katsos "did not like it very much."  Tr. 101.  He had never set up a backup system for the Katsos law office "because I was never asked and I did not do any backup system" for her.  *Id*.  Nor did Sloboda ever set up an email system for the Katsos law office.  *Id*.

On cross-examination, Sloboda testified that he was not aware that the Katsos law office did not have a backup system and that he was never asked to back up the data.  Tr. 105.  He found out that there was no backup system at the time the computer crashed and he was attempting to fix the problem.  *Id*.  As to replacing the hard disks, Sloboda confirmed that he would take the hard disk that had been compromised and transfer the data on it to a different hard drive in the hope of transferring the data into a functional hard drive.  Tr. 107.  When asked why he destroyed the old hard disks, Sloboda confirmed that this was done to prevent the data from falling into the wrong hands.  Tr. 107-108.  However, he did not agree with counsel that the hard drive data was potentially able to be recovered – or pieces of it – but in order to try to do so it would be incredibly expensive.  Tr. 109.  Sloboda testified that in his opinion, it was not worth the effort, which is what he told Barbara Katsos.  Tr. 109-110.

When asked if Barbara Katsos asked him to keep the hard drives before he destroyed them, Sloboda responded that he had them at home and asked her some time later what to do with them. Tr. 110. Sloboda stated that Katsos asked him if he tried some other options and he said that he did, but he "could not get anything out of it. It looked like a lost cause and I asked her if I can discard the hard disk and she agreed to do that." *Id.* He never sent the disks to one of the expensive forensic companies. *Id.* He understood that Katsos' office had everything on paper and had extensive file cabinets. Tr. 111. At some point prior to the computers crashing, Sloboda says Katsos told him that the office had paper copies of everything. *Id.*

According to Sloboda, in the early stage when the office went to five computers, the work group had a shared folder, but when the "infections were starting to happen, and it was some years before, that option was disabled. Tr. 111-112. Sloboda did not know if the staff saved their emails even locally on AOL. He primarily dealt with hardware issues and not software solutions. Id. In 2009, he was mostly replacing the parts on the computers, not purchasing new computers. Tr. 113. Those replacements parts were primarily hard disks. Sloboda did not see staff members ever using portable storage devices, memory cards, key cards, or USB drives or any other detachable device to store data, but he said they could have. Tr. 114. The paralegal had a Blackberry telephone but he did not know if Barbara Katsos ever had a Blackberry. *Id.* Sloboda did not help anyone to set up a Blackberry to communicate with the computers. Tr. 114-115. And he never communicated with Barbara Katsos by email. Tr. 115. As an

After being asked in several ways if there was any method or way he could think of to get any of the data or if he could think of any other place where the computer data might reside or still exist, Sloboda responded no. Tr. 116. Nor was there any document that would help him

remember or find out at what time a particular computer's hard drive in Katsos office had to be replaced. *Id.* And he had no calendar which would show his visits since he had moved three times in the interim. Tr. 117. The best he could recall was that it "was the end of 2008 – some – the winter – that cold, cold part of the 2008 or the cold spring part of 2009. That's what I can say." *Id*.

### D. The Post-Hearing Briefs

Plaintiffs' post-hearing submission consists primarily of a summary of the hearing testimony, with counsel's conclusions about what the testimony meant, and without citations to supporting case law.[5] Defendants' provided a more abbreviated summary of the testimony, along with some limited legal argument and citations to case law.

Plaintiffs maintain that Defendant Katsos' "destruction of ESI" shows that she acted intentionally or was grossly negligent. *See* Plaintiffs' Brief Regarding June 4, 2013 Sanctions Hearing ("Pls.' Brief") [DE 59] at 1. According to Plaintiffs, "Katsos allowed each and every one of her 5 different computers to be destroyed (containing all of her ESI, including e-mails, electronic documents and her billing records stored thereon), failed to initiate any meaningful litigation hold on ESI preservation, and directed that all her hard drives be destroyed." Pls.' Brief at 1. Plaintiffs' counsel asserts that Kastos' hearing testimony is inconsistent with her previously submitted affidavits as to the number of computers involved and the timing of the destruction of the emails at issue. *Id.* at 2-3, 5. Plaintiffs also highlight that Katsos (1) had no invoice system

---

[5] The Court is compelled to point out that post-hearing briefs were limited to ten pages, particularly in light of the voluminous submissions on the original motion for sanctions. Plaintiffs' brief is 11 pages and contains 25 footnotes, all in a smaller font, with no spacing between the notes – done in a less than subtle manner presumably to get around the ten-page restriction. The Court could have rejected the brief on that basis alone.

and "did not have, produce, or maintain any billing records, *id.* at 4; (2) directed Sloboda to destroy the hard drives, *id.* at 5; (3) did not make any effort to obtain the passwords of staff members or institute a litigation hold following her duty to preserve, *id.* at 6-7; and (4) prevented Plaintiffs from further demonstrating the conflict in Katsos' dual representation of both Michael DiStefano and Franco Treglia because of missing/destroyed contemporaneous itemized billing records which would have contained detailed time entries of the work actually being done on the DiStefano matter. *Id.* at 6-10. Based on the hearing testimony, Plaintiffs contend that "Katsos was acting with a sufficiently culpable state of mind to award sanctions for the destruction of ESI and/or relevant ESI that was helpful to Plaintiffs' claims, and/or harmful to Katsos. . ." *Id.* at 11.[6] Because of Katsos' status as an attorney, Plaintiffs argue that she should be held to a higher standard in assessing the degree of culpability here. Plaintiffs seek an adverse inference or "other sufficient sanction awarded to remedy the spoliation of ESI." *Id.*

On the other hand, Defendants maintain that there is "no evidence of any bad faith or willfulness by Barbara Katsos and no evidence that any documents were destroyed." *See* Defendants' Post-Hearing Memorandum of Law ("Defs.' Brief") [DE 60] at 2. Moreover, Defendants argue, "Plaintiffs have failed to demonstrate how any of the alleged lost materials were relevant to and supportive of their claims in this litigation and there was no evidence

---

[6]     Plaintiffs reference *Vendor Capital Corp. v. DiStefano et al.*, which was before the Supreme Court, Nassau County in 2008, and state that Defendant Katsos "had just been admonished by a Judge in the N.Y. Sup. Court . . . for involvement in potentially fraudulent conveyances, and failure to respond to discovery demands regarding those conveyances." Pls.' Brief at 2 and 2 n.4; *see also* Affirmation of John A. Karol, Esq. In Support of Plaintiffs' Motion for Sanctions and Other Relief ("Karol Aff.") [DE 34], ¶ 20. The purpose of Plaintiffs interposing this information seems clear. However, in its discretion, the Court declines to consider this information as outside the scope of the instant proceedings.

adduced at the hearing to support this requisite element of their claim of spoliation. Defs.' Brief at 2.

Defendants rely on Katsos' testimony that although she did not access any of the emails in her account for matters involving Michael DiStefano when DiStefano terminated her services in February 2009, Katsos had "already printed out all substantive e-mails pursuant to her own policy." *Id.* at 4. Those printed out emails were already in the file and were turned over to Plaintiffs' counsel. *Id.* As to legal bills for DiStefano, Defendants point out that generally, the bills were mailed and a copy placed in the file and some were actually emailed to DiStefano by paralegals Jesika Thompson and Jason Cianfante. *Id.* Counsel emphasizes Katsos' testimony that she did not destroy anything from the DiStefano files and in fact implemented the equivalent of a litigation hold when she "advised her staff to put all the files related to the DiStefano matters together and that they be kept together in the conference room so as not to get lost and to be made available to her attorneys." *Id*. at 4-5.

As to his client's testimony regarding Jan Sloboda, Defendants' counsel points to the fact that Sloboda did not install a network server, but rather a "work group connection" to connect all of the computer to the internet. *Id*. at 5. When Katsos contacted Sloboda about the blue or black screen on her computer, Defendants maintain that because of the virus, Sloboda said he had to replace the hard drives on the units and Katsos asked him to save the data that was on the computers. *Id*. When Sloboda was unable to retrieve any data, Defendants rely on his testimony that he told Katsos it was his opinion that the data was not recoverable and that additional recovery effort would have to be done by a larger entity specializing in such services, which would be very expensive. *Id*. In contrast to Plaintiffs' assertion that Katsos ***directed*** Sloboda to

destroy the hard drives, Plaintiffs take the position that Sloboda was ultimately the individual who determined that the hard drives should be removed from the office and discarded. Consequently, Defendants argue that Barbara Katsos was not acting with a culpable state of mind, *id*. at 7, and that Katsos' regular practice of "printing out all substantive e-mails relating to client representation, ensure that the great majority of documents relating to the representation were retained and produced in this litigation." *Id*. at 8.

Further, Defendants argue that Plaintiffs have not established the third prong of the test set forth in *Byrnie* – that the purported missing ESI was relevant to the party's claim or defense – so that a jury could find that the missing ESI would support that claim or defense. *Id*. Defendants' counsel asserts that under applicable Second Circuit case law, notwithstanding a party's deficient efforts at preservation, "sanctions are not warranted unless there is proof that some information of significance was lost." *Id.* at 9 (citing *Orbit One Commc'ns., Inc. v. Numerex Corp*., 271 F.R.D. 429, 431 (S.D.N.Y. 2010). Finally, Defendants contend that the Plaintiffs failed to show that any additional emails sent out by the firm paralegals or Mr. Prounis to Michael DiStefano and which may have been lost because of the computer virus were "anything other than non-substantive emails that would not have been relevant or significant to plaintiffs' claims in this case." *Id*. at 10.

IV.    <u>**APPLICABLE LEGAL STANDARD**</u>

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *accord Byrnie v. Town of Cromwell*, 243 F.3d 93, 107 (2d Cir. 2001). A court may impose sanctions against a party who

spoliates evidence pursuant to Rule 37(b) of the Federal Rules of Civil Procedure as well as through the Court's inherent powers to control the judicial process and the litigation before it. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002); *West*, 167 F.3d at 779; *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, 783 F. Supp. 2d 736, 741 (S.D.N.Y. 2011); *Zubulake v. UBS Warburg LLC* ("*Zubulake V*"), 229 F.R.D. 422, 430 (S.D.N.Y. 2004). In situations where sanctions are warranted, district courts have broad discretion in "crafting an appropriate sanction for spoliation." *West*, 167 F.3d at 779; *see Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) ("The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge . . . ."); *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses."). The applicable sanction "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *West*, 167 F.3d at 779. Stated another way, the selected sanction should be designed to "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Id.* (internal quotation marks omitted); *accord Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012).

In some instances, the spoliation of evidence "can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Zubulake V*, 229 F.R.D. at 430 (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). A sanction in the form of an adverse inference instruction is, however, "an extreme sanction and should not be

imposed lightly." *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008); *see Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 219 (S.D.N.Y. 2003) ("*Zubulake IV*") ("In practice, an adverse inference instruction often ends litigation – it is too difficult a hurdle for the spoliator to overcome.").

Once again, a party seeking sanctions has the burden of establishing "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp.*, 306 F.3d at 107 (quoting *Byrnie*, 243 F.3d at 107-12); *accord Centrifugal Force, Inc. v. Softnet*, 83 F. Supp. 2d 736, 741 (S.D.N.Y. 2011); *Zubulake V*, 229 F.R.D. at 430. With these principles in mind, the Court now turns to the second and third prongs of the test to establish spoliation of evidence.

## V.    DISCUSSION

The Court concludes that the ultimate failure to save emails violated Katsos' duty to preserve ESI regarding communications between (1) herself and the plaintiffs and (2) herself and non-parties. Plaintiffs have argued that these communications go directly to the issues raised by the DiStefanos in the alleged legal malpractice claims they assert against Katsos in this case. However, that is not the end of the spoliation analysis. The Court now turns to the second and third prongs of the *Byrnie* standard regarding spoliation of evidence.

A.    **Culpable State of Mind**

1.    *The Law in the Second Circuit*

"Even where the preservation obligation has been breached, sanctions will only be warranted if the party responsible for the loss had a sufficiently culpable state of mind." *In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 195 (S.D.N.Y. 2007); *see Residential Funding*, 306 F.3d at 107-08; *Byrnie*, 243 F.3d at 109. Failures to preserve relevant evidence occur "'along a continuum of fault -ranging from innocence through the degrees of negligence to intentionality.'" *Reilly*, 181 F.3d at 267 (quoting *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988)). In this Circuit, "the 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to breach a duty to preserve it, or negligently.'" *Residential Funding Corp.*, 306 F.3d at 108 (quoting *Byrnie*, 243 F.3d at 109) (internal alterations and emphasis omitted); *Curcio v. Roosevelt Union Free Sch. Dist.,* 283 F.R.D. 102, 111(E.D.N.Y. 2012).

"'In the discovery context, negligence is a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." *In re Pfizer Secs. Litig.*, 288 F.R.D. 297, 314 (S.D.N.Y. 2013) (internal quotations omitted); *accord Harkabi v. SanDisk Corp.*, 275 F.R.D. 414, 418-19 (S.D.N.Y. 2010)). A party is negligent even if the failure "results from a pure heart and an empty head." *In re Pfizer*, 288 F.R.D. at 314; *Curcio*, 283 F.R.D. at 111; *see Mastr Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc.*, 295 F.R.D. 77, 84 (S.D.N.Y. 2013), *aff'd* No. 12 CIV. 7322 HB, 2013 WL 6840282 (S.D.N.Y. Dec. 27, 2013) ("In order to 'protect the innocent litigant from the destruction of evidence by a spoliator who would otherwise assert an empty head, pure heart

defense,' one who fails to preserve evidence will be sufficiently culpable even when acting with ordinary negligence.") (quoting *Orbit One*, 271 F.R.D. at 438) (alterations omitted).

"It follows that gross negligence also satisfies the culpability requirement." *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 503 (S.D.N.Y. 2013) (citing *Chin*, 685 F.3d at 162); *see Residential Funding Corp.*, 306 F.3d at 109. "'Gross negligence has been described as a failure to exercise even that care which a careless person would use.'" *Williams v. New York City Transit Auth.*, No. 10 CV 0882, 2011 WL 5024280, at *7 (E.D.N.Y. Oct. 19, 2011) (quoting *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., L.L.C.*, 685 F.Supp.2d 456, 463-64 (S.D.N.Y. 2010) (abrogated on other grounds by *Chin*, 685 F.3d 135)). Courts in this circuit have found that the "failure to preserve evidence resulting in the loss or destruction of relevant information is surely negligent, and, depending on the circumstances, may be grossly negligent." *Pension Comm.*, 685 F. Supp. 2d at 464–65; *see SJS Distribution Sys., Inc. v. Sam's East, Inc.*, No. 11 CV 1229, 2013 WL 5596010, at *4 (E.D.N.Y. Oct. 11, 2013). Moreover, although the failure to institute a "litigation hold" is not gross negligence *per se*, whether the party implemented good document preservation practices is a factor that courts should consider "in the determination of whether discovery sanctions should issue." *Chin*, 685 F.3d at 162; *see Orbit One*, 271 F.R.D. at 441. The Court may also consider Defendant Katsos' "status as an attorney and the fact that [she] certainly should have been aware of the preservation requirements of litigation." *DiStefano*, 2013 WL 1339548, at *8 (citing *Elmo v. Callahan*, No. 10-CV-286, 2012 WL 3669010, at *12 (D.N.H. Aug. 24, 2012) ("[L]itigants (especially when they are lawyers) who act intentionally or with willful disregard to subvert their opponents' ability to find and offer relevant evidence should face harsh sanctions . . . .")); *accord Neverson-Young v. BlackRock, Inc.*,

No. 09-CV-6716, 2011 WL 3585961, at *3 (S.D.N.Y. Aug. 11, 2011) (finding plaintiff who donated her laptop "merely negligent" based on the fact that "[i]n contrast to corporate actors . . . [plaintiff] is unsophisticated and unaccustomed to the preservation requirements of litigation.").

### 2. Katsos' State of Mind

At the outset, there is no dispute that in 2009, there were five computers being used in the day-to-day operations of the Law Offices of Barbara H. Katsos, P.C.[7]  Michael DiStefano terminated Katsos' services in February 2009, prior to the alleged destruction of the ESI at issue here.  It is also undisputed that Katsos did not have a back-up system in place to preserve data in the event anything happened to compromise the existing computers.   While it is clear that the hard drives for the five computers were eventually destroyed by Jan Sloboda, the question remains how much of the data on those hard drives, particularly the emails in the AOL accounts, had actually been preserved by Katsos through her then somewhat primitive retention protocol –  the answer to which none of the parties here are ever likely to know with any degree of certainty. The Plaintiffs argue that Katsos had no *written* policies or procedures in place at the law firm regarding the preservation or destruction of documents generally, nor any procedures for preserving ESI, including email communications.  The hearing testimony bears out that position.

---

[7]     The Plaintiffs have continued to assert that Katsos' hearing testimony is inconsistent with her previously submitted affidavits as to the number of computers involved and the timing of the destruction of the emails at issue. Pls.' Brief at 2-3, 5 ("Katsos' prior affidavits were at the best, vague and inconsistent, and perhaps deliberately evasive").  Although far from being models of clarity and completeness (and not fully responsive to the Court's directives), the Court does not find the affidavits inconsistent with the hearing testimony.  The affidavits are brief and leave out many of the details amplified at the evidentiary hearing.  The Court finds that the additional hearing testimony was likely the result of the Court's cautions and admonishment to Katsos to be prepared to answer the questions at the hearing with specific information within her knowledge and understanding.

The retention or preservation protocol in the Katsos' firm in 2009 was to type documents and correspondence on the computer and then make a hard copy of everything, put it in the client's file, and store the files in the 100 office file cabinets. The firm maintained hard copy documents consisting of certain materials relating to the specific matter being worked on for each client – in this case the DiStefanos – but only "substantive" email communications were printed out and eventually put in the client's file.

Likewise, Katsos did not issue any written instructions to her staff regarding the obligation to preserve e-mails and ESI in connection with client matters, nor did she issue any specific instructions to preserve e-mails or ESI following the receipt of the letter from Michael DiStefano terminating her representation, which reasonably should have alerted her to the prospect of potential problems with the clients, including possible malpractice claims. The selection of "substantive" emails was entirely subjective and left to the discretion of Katsos. Significantly, Katsos did not know what a "litigation hold" was when she was asked during the hearing. *See Mastr Adjustable Rate Mortgages Trust 2006 v. UBS Real Estate Securities, Inc.*, 295 F.R.D. 77, 85 (S.D.N.Y. 2013) ("A litigation hold is not, alone, sufficient; instead compliance must be monitored.")

Katsos maintains that she did not knowingly or willfully destroy relevant information. It is apparent from her testimony that she believed her actions were reasonable and not negligent at time she undertook them, though she acknowledged that she has learned a great deal as the spoliation aspect of this case has unfolded. Katsos insists that she preserved all of the substantive emails which came into or went out of the office – in most cases so she could remember what she had said or done. In sum, she believes that any emails that have not been retrieved would not lead

to the discovery of admissible evidence.  The Plaintiffs essentially counter that Katsos'

characterization of her actions as not being knowingly or willfully destructive is not a defense

here because the emails were knowingly discarded/destroyed, even if Katsos did not intend to

breach any duty to preserve them.

The Court finds that Plaintiffs have met their burden of showing that Katsos acted with the

requisite culpable state of mind.  In reaching this conclusion, the Court points out some of the

factors more clearly brought to light during the hearing:

- Katsos was well aware that her office manager was not very computer
  literate and hired her knowing that (Tr. 14-15);

- from the time she left the Cathedral School, Katsos never took a course in
  computers or any CLE courses in computer management, nor did she even
  know the brand name of the computer in her office (Tr. 21);

- having never previously met Jan Sloboda, Katsos hired him on the word of
  a colleague; she never had any written contract or agreement with Sloboda
  (Tr. 23);

- Katsos paid Sloboda in cash and on occasion did some legal work for him
  in exchange; she admits she was not computer savvy, but also made no
  attempt to understand the computer set-up in her office nor any
  maintenance protocol, other than when something went wrong, she called
  Sloboda (Tr. 23);

- her approach to "saving" emails was to print out only those she considered
  to be "substantive" (Tr. 25); she never instituted any mechanism to save
  the AOL emails on her own local computer (Tr. 33-34); when DiStefano
  terminated her legal services, she did not do anything with respect to his
  emails because she had already printed out the previous substantive ones;
  when the computer problems occurred, she would not have been able to do
  anything about them anyway (Tr. 58-59);

- in 2008-09, each person working at the firm had a separate AOL account,
  each with its own separate email address and password; Katsos had no
  control over any of the email accounts except her own, did not know any

of the passwords for the other accounts, and made no attempt to find out those passwords (Tr. 26-30);

- when her attorney asked her to go back and attempt to access the email accounts of her former staff members, she was unsuccessful because she did not know the passwords, did not know the security answers and was blocked out (Tr. 31);

- Katsos had no service agreements for any of the computers and no records to show when the computers were purchased, no records of cash expenses for servicing the computers, even for tax purposes (Tr. 39, 47-48);

- when Katsos discussed with Sloboda setting up the five computers in 2008, she did not give him any direction as to the system requirements; she did tell him these were client files and she assumed he understood they were lawyer's files and were confidential (Tr. 49-50);

- Katsos never asked Sloboda to set up a back-up system for the computer files because she thought he would do whatever needed to be done in a lawyer's office and that he knew how to do that (Tr. 50);

- although Katsos could not remember whether she sent any bills/invoices to DiStefano and Treglia beyond the nine pages from 2007 shown to her in PX 2, the additional emails presented as PX 3 show that both of her paralegals, Jesika Thompson and Jason Ciarlante, sent invoices to DiStefano by email in 2008 and 2009 (Tr. 70-77)

Although Katsos had a loose procedure for preserving written documents which had been typed on the computer, she had no policies or procedures in place for ensuring the preservation of electronic information. Instead, it appears that her general practice was not to preserve all emails and to leave to her discretion the ones which were sufficiently "substantive" and were to be downloaded and placed in the clients' files. See *F.D.I.C. v. Horn*, No. CV 12-5958, 2015 WL 1529824, at *12 (E.D.N.Y. Mar. 31, 2015). This is one of the factors that cannot be ignored in the Court's determination whether to impose sanctions. *Chin*, 685 F.3d at 162.

Moreover, as an attorney, Katsos should have been familiar with her ethical "obligation to preserve documents in the event that litigation seems likely for a particular matter." *SJS Distribution Sys., Inc.*, 2013 WL 5596010, at *4; *see Distefano*, 2013 WL 1339548, at *7. It is also difficult to fathom how an attorney would not have taken steps to obtain and secure the passwords for the other four computers in the office. While the failure to timely institute a litigation hold does not constitute gross negligence *per se*, *see Chin*, 685 F.3d at 162, the facts here establish Katsos' failure to take basic steps to preserve ESI, even after DiStefano's letter terminating her representation. *SJS Distribution*, 2013 WL 5596010, at *4; *see Dataflow, Inc. v. Peerless Ins. Co.*, No. 3:11-CV-1127, 2013 WL 6992130, at *7 (N.D.N.Y. June 6, 2013) (finding gross negligence where defendant failed to preserve e-mails related to plaintiff's claim during a system upgrade, and where the record was devoid of evidence that defendant ever implemented a litigation hold).

However, contrary to the Plaintiffs' argument that Katsos acted intentionally or was grossly negligent, the Court is not convinced that Katsos' conduct supports a finding of gross negligence. As the court noted in *Williams*,

> Neither negligence or gross negligence has been clearly defined in the context of discovery misconduct, such as spoliation. These terms simply describe a continuum. Conduct is either acceptable or unacceptable. Once it is unacceptable the only question is how bad is the conduct. That said, it is well established that negligence involves unreasonable conduct in that it creates a risk of harm to others.

2011 WL 5024280, at *7 (internal citation, quotation marks, and alterations omitted). Here, Katsos insists that no documents or information were intentionally destroyed. But she does not refute the fact that she permitted Jan Sloboda ultimately to remove the computers from the office.

She did ask Sloboda, as he confirmed, whether any of the data could be saved.  When Sloboda

told her that he doubted it and that the hard drives would have to be sent to a large vendor

experienced in retrieving the data in such circumstances – which in his opinion was not worth it  –

Katsos did not attempt to get an estimate of the cost to retrieve that data before permitting

Sloboda to discard it.  The Court disagrees with Plaintiffs' assertion that Katsos "*directed* Sloboda

to destroy the hard drives."  The testimony of both witnesses does not support that assessment.

Similarly, it is difficult to credit Plaintiffs' broad claim that Katsos "destroyed everything," when,

in fact, Defendants produced 10,000 pages of documents during discovery.

"A fair reading of the record overall indicates that [Katsos] did not act in bad faith."

*Abcon Assocs., Inc. v. Haas & Najarian*, No. CV 12-928, 2014 WL 4981440, at *12 (E.D.N.Y.

Oct. 6, 2014); *see Mastr*, 295 F.R.D. at 85.  In particular, although Katsos permitted Sloboda to

take away the computer hardware, she did not do so with the intention of destroying potentially

relevant ESI.  *Compare Sekisui*, 945 F. Supp. 2d at 506 (finding "ESI was willfully destroyed"

where it was undisputed that the plaintiff directed that the ESI be permanently deleted and

"demanded the destruction" despite the fact that the an employee "recommended against such

action").  The Court notes that Katsos was licensed to practice law in 1997 after a lengthy career

as a teacher and educational administrator.  She had no training in using computers in a law office

context at any time since she was licensed.  Rather than bad faith, the Court finds that Katsos'

actions were occasioned by (1) her position as a solo practitioner utterly naive about her

obligations to preserve electronic evidence and (2) her total reliance upon and complete delegation

to an outside consultant the responsibility for setting up and maintaining the computer system in

her office.  Moreover, Katsos' utter ignorance of (i) her ESI preservation responsibilities and (ii)

her saving "substantive" emails to the files can be considered, to some degree, as "positive evidence of good faith" *Mastr*, 295 F.R.D. at 85. The record shows that Katsos subjectively believed that by downloading copies of select emails she perceived to be substantive, she had no duty to preserve any others. While, as noted above, this mistaken belief does not excuse the failure to preserve, it does undercut the existence of bad faith. *Id.*; *see, e.g.*, *Abcon*, 2014 WL 4981440, at *12.

Based on the foregoing factors, the Court finds that, on the "continuum of fault ranging from innocence through the degrees of negligence to intentionality" in determining a culpable state of mind, this case falls on the spectrum somewhere between negligence and gross negligence, and closer to the former than the latter. *Residential Funding Corp.*, 306 F.3d at 108 (internal punctuation and citations omitted). While the Court does not find evidence of intentional, malicious spoliation in this case, Katsos has, at the very least, acted with "a pure heart and an empty head." *In re Pfizer*, 288 F.R.D. at 314; *see Harkabi*, 275 F.R.D. at 419 (quoting *Pension Comm.*, 685 F.Supp.2d at 464); *see also Mastr*, 295 F.R.D. at 85 ("That [defendant] acted in good faith does not mean, however, that it lacks the requisite culpability."). Taking all of these factors into account, the Court finds that Katsos had a sufficiently culpable state of mind.

### B.     Relevance of the Evidence

#### 1.     *Applicable Law*

Relevance may be assumed where the breaching party acted in bad faith or with gross negligence. *Neverson-Young*, 2011 WL 3585961 at *2; *Orbit One*, 271 F.R.D. at 441 (refusing to presume relevance where the evidence was merely destroyed due to the party's failure to abide by recommended preservation practices). However, where the spoliating party has acted only

46

negligently, the moving party must make a showing that the lost materials were relevant. *In re Pfizer*, 288 F.R.D. at 315; *Harakabi*, 275 F.R.D. at 419-20; *Deanda v. Hicks*, 13 Civ. 1203, 2015 WL 5730345, at *6 (S.D.N.Y. Sept. 30, 2015). A party may establish relevance by "'adducing sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.'" *Harakabi*, 275 F.R.D. at 420 (quoting *Residential Funding Corp.*, 306 F.3d at 109) (interanal alterations omitted). "Courts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence because doing so would subvert the purposes of the adverse inference, and would allow parties who have destroyed evidence to profit from that destruction." *Residential Funding Corp.*, 306 F.3d at 109 (internal alterations and citations omitted); *accord Slovin v. Target Corp.*, No. 12-CV-863, 2013 WL 840865, at *5 (S.D.N.Y. March 7, 2013).

### 2. *Relevance of Unpreserved Emails*

In light of the Court's determination that Katsos' conduct falls somewhere between "negligent" and "grossly negligent" on the continuum (and closer to the "negligent" end), the Court finds it necessary for Plaintiffs to make a showing that the lost materials are relevant. To determine whether the unpreserved emails would have been relevant to the claims and/or defenses raised in this case, the Court must look to the nature of the underlying malpractice claims. Those claims against Katsos focus on: (1) the creation of the irrevocable trust allegedly to protect Plaintiff Distefano's personal assets from the creditors of SharpImage; (2) Katsos' advice not to negotiate with creditors and the impact on Telerent which caused it to sue the Distefanos, Treglia and SharpImage; (3) the conflict of interest in Katsos' simultaneous representation of both

Distefano and Treglia; and (4) Katsos' alleged failure to take action to prevent Cold Stone Creamery from terminating the Franchises.

In the previous decision setting this case down for the evidentiary hearing, the Court pointed out that Plaintiffs had tried to delineate "general categories of documents that have been adversely affected." *DiStefano,* 2013 WL 1339548, at *9. As the Court then stated, merely laying out these categories (*i.e.*, emails between the parties; billing and invoices and attorney time records; internal emails; other ESI such as drafts of documents, research, calendars) does not satisfy Plaintiffs' burden to produce sufficient evidence from which the Court could infer that the categories listed were indeed destroyed. *See In re Pfizer*, 2013 WL 76134, at *21 (finding general description of the allegedly destroyed documents insufficient to establish relevancy); *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 122-23 (S.D.N.Y. 2008) (same). On that basis, the Court informed Plaintiffs they would be given the opportunity to question Defendant Katsos at the hearing with regard to the third prong of the spoliation test. *DiStefano,* 2013 WL 1339548, at *10.

At the hearing, Plaintiffs' counsel introduced a number of 2007 invoices sent by the Law Office of Barbara Katsos/Jesika Thompson to Michael DiStefano, Franco Treglia and Eversharp Physical Therapy, containing billed time entries and disbursements, with a folder/cover sheet stating "DiStefano Bills." These Invoices were produced by the Defendants as reflected in the Bates' numbers "CKBB 000941-950." *See* PX 2. Plaintiffs also moved into evidence a composite exhibit of (1) several 2006 and 2007 bills for legal services from Barbara Katsos to DiStefano and Treglia, (2) a 2007 letter from Barbara Katsos to DiStefano and Treglia advising them of the status of another case pending in Queens County, (3) several 2007 emails between

48

paralegal Jesika Thompson and Michael DiStefano forwarding and responding to enclosed billing statements, and (4) an August 30, 2007 email from paralegal Christopher McCarthy to DiStefano transmitting the August 31, 2007 invoice for SharpImage. These materials, however, were produced by the Plaintiffs as reflected by Bates numbers "DiStefano 00745, 01045-047, 00255-256, 00249-250, 00243, 00232-234, 00229 and 00224." PX 3. The last exhibit entered into evidence consists of seven pages of 2008 emails – one with a single page attachment – from Jason Ciarlante, Katsos' paralegal, forwarding invoices to DiStefano, along with some responses to those emails. The last email in that grouping is dated February 27, 2009 and was sent from Ciarlante to DiStefano with the message "Herewith transmitted please find your Final Invoice." PX 4. The invoice attached to that email lists time billed for "Review of Discovery Demands" and two separate entries for "Transmittal Letter with Discovery Demands," one sent to DiStefano and one sent to Treglia. *Id.* These materials were also produced by Plaintiffs and are marked with Bates' numbers "DiStefano 00192, 00180, 00177-178, 00039, 00025, 00016-017." *Id.* No other exhibits (except PX 1 which was previously discussed) were introduced at the hearing.

Although the Court acknowledges that the sum total of the emails introduced at the hearing, especially those coming from the Katsos' production, is small, the Court is also mindful of the 269 emails retrieved and produced by Plaintiff DiStefano from his own computer. Although none of these emails were cited or introduced at the hearing, Plaintiffs attached a full set of these emails as Exhibit D, Parts 1, 2 and 3, to the Affirmation of John A. Karol, Esq. in Support of Plaintiffs' Motion for Sanctions and Other Relief ("Karol Aff.") [DE 34]. Attorney Karol states that "[t]his production therefore represents 269 pages of information that Ms. Katsos allowed to be destroyed, that had Mr. DiStefano not managed to preserve, would have been lost."

Karol Aff. ¶ 8.  Plaintiffs also maintain that these emails "contain information that is negative to Defendants – including, for example, the fact that the Defendants were engaged in setting up the trusts complained of, and knew that the course of action they were counseling Plaintiffs to take, were in all likelihood going to be considered fraudulent conveyances." *Id*. ¶ 15.  The Court notes that counsel did not identify any such emails by Bates' number, but rather by general conclusions. Indeed, the Court found no such emails in the compilation and questions the logic and reasonableness of an unsupported assumption that any attorney would commit to writing information which the attorney knew would likely be deemed a fraudulent conveyance as Plaintiffs contend.  Counsel further maintains that ". . . emails have been lost showing *inter alia* what Ms. Katsos and Defendants actually did in their representation of Plaintiffs, what was communicated between Plaintiffs and Defendants, and what was communicated between Defendants and third parties, including information that could be used to substantiate Plaintiffs' position." *Id.* ¶ 14.  However, Plaintiffs do not identify the "what" referred to, nor do they point to any specific email among the 269  produced that provides a factual basis for the link Plaintiffs wish the Court to make here.

The Court has examined the full set of emails (Karol Aff., Ex. D, Parts 1, 2 and 3) from the DiStefano production.  Many of the pages show routine attorney-client communications which one might expect between DiStefano and the Katsos firm (transmitting forms, reminders of court appearances and other appointments, inquiries and responses about what has been paid toward legal bills, inquiries to and responses from Ted Prounis about tax issues).  Other pages show lists of questions from DiStefano to Katsos, with very short responses from Katsos, often stating that they will talk.  Other emails show DiStefano following up in writing on conversations he had with

Katsos. There are also many pages reflecting communications between DiStefano and third parties (copied to Katsos) when DiStefano was attempting to gather information from other Cold Stone Creamery franchisees, along with correspondence with the attorney who was handling the Cold Stone litigation.

One thing which stands out to the Court after such review is the pattern and number of responses made by Jason Ciarlante to DiStefano's inquiries. The Court finds this fact significant in that it appears Barbara Katsos herself did not utilize email as a regular means of communicating with Michael DiStefano, but rather had her paralegal convey those responses. This finding lends some support to Katsos' sworn statement that

> [w]hile I did communicate with Mr. DiStefano through email, it was mostly in response to his emails and only to provide him brief answers to his queries or to advise that I would follow-up with him over the phone. Generally, I prefer to speak about substantive matters with my clients over the phone or in person and that was my practice with Mr. DiStefano. In addition, most of my contacts with other persons involved in the DiStefano matters, such as my communications with Telerent counsel and our local counsel in North Carolina, were by telephone or written correspondence rather than email.

May 2, 2012 Affidavit of Barbara Katsos in Opposition to Sanctions Motion ("Katsos Aff. I") [DE 40], ¶ 6.

Defendants argue in their initial opposition to the motion for sanctions that Plaintiffs' counsel "mischaracterizes what was produced to them in the initial ten thousand pages of documents produced, claiming there were only a 'few e-mails.'" Affirmation of Marc R. Wilner, Esq. In Opposition to Plaintiffs' Motion for Sanctions and Other Relief ("Wilner Aff.") [DE 42], ¶ 5. Attorney Wilner added that "[w]hile some of the emails are duplicates from the maintained files there are many more than simply a few e-mails that plaintiff would have this Court believe."

*Id.* Significantly, Attorney Wilner points out that ". . . we offered to allow plaintiffs' counsel to come to our office to inspect the files but plaintiffs' counsel never responded to that offer." *Id.* ¶ 6. The Court notes that by simply taking Exhibits A and B alone (attached to the Wilner Affirmation), there are 200 pages of material, representing approximately 2% of the Katsos document production (10,000 pages). Within these first 200 pages are 97 email exchanges, a fact which undermines Plaintiffs' argument that "very few" emails were produced, particularly since this calculation represents a mere 2% of the production.

After the initial production, Defendant Katsos learned that she could access her "sent box" from the time period at issue and was able to recover some other emails. *Id.* ¶ 12; *see* March 5, 2012 Affidavit of Barbara Katsos in response to Court's Feb. 17, 2012 Order ("Katsos Aff. II"), annexed to the May 3, 2012 Wilner Aff. as Ex. 1, ¶ 8. Those emails were served in a supplemental production to the Plaintiffs and are attached as Exhibit 1 to the May 2, 2012 Katsos Affidavit as Exhibit 1. Katsos Aff, I, Ex. 1.

Having reviewed the supplemental production made by Katsos, the Court points out that this production consists of another 57 pages of emails. *See id.* The Court notes that there are a handful of duplicate emails in this grouping. Overall, the emails are not in chronological order, but they cover a time frame from October 2006 through February 2009. As to content, the emails run the gamut and include, among other things: DiStefano forwarding information to Barbara Katsos regarding the lawsuit against Cold Stone Creamery; DiStefano notifying the law office that Cold Stone was raising his rent; DiStefano forwarding emails to Katsos regarding the issues and activities of other Cold Stone franchisees, especially Tony Mauro; DiStefano asking for feedback on a letter he drafted to Cold Stone; DiStefano questions to Katsos and paralegal

Thompson about adding items to the Eversharp Trust property list; Scott Kreppein's (DiStefano attorney in lawsuit against Con Ed regarding blackout damages ) email to Katsos asking her to contact him; New York State Court law clerk's email to DiStefano, copied to Katsos, regarding next day mediation before the special referee in the Vendor Capital matter; and various emails to Katsos from the attorney at Hiscock and Barclay handling the Telerent matter regarding motion papers, a court conference, and the need to bring a $100,000 check from her escrow regarding the Vendor Capital matter. There are also two October 2006 interoffice emails from Jesika Thompson to Katsos about a meeting with DiStefano as well as a fax from DiStefano to Thompson to set up a three-way teleconference about transferring property titles to a trust, with attachments from CitiMortgage. *Id.*

The Court finds that the arguments regarding the 269 emails cut both ways. Plaintiffs argue that emails produced by the Defendants confirm that Katsos did, in fact, engage in relevant e-mail communications. Defendants contend that, even if any other emails existed, they would not be relevant to Plaintiffs' claims. Having reviewed the emails independently, the Court points out that there are almost none which provide a link to draw a conclusion that other emails must have existed, beyond speculation, regarding advice Katsos gave to DiStefano not to negotiate with creditors, or Katsos' failure to take action to prevent Cold Stone Creamery from terminating the Franchises – two of the four components of the malpractice claim. There are some emails from DiStefano relating to trust properties – mostly informing Katsos of what he was doing or asking questions – but the Court is not convinced based on the record that Plaintiffs have met their burden to establish that Katsos either intentionally or negligently destroyed any emails offering DiStefano advice about these issues or strategies or any knowledge of fraudulent

53

conveyances.[8] Nor does it appear that either side has taken the time to carefully parse the emails which actually are contained within the 10,000 pages of documents which Katsos did produce. However, the invoices in evidence and those in the productions do show that Katsos apparently was simultaneously representing both DiStefano and Treglia, which goes to the Plaintiffs' conflict of interest claim. In light of anticipated testimony from DiStefano and perhaps from Treglia, along with the emails, Plaintiffs are in a position to proceed with their conflict of interest claim and to present documentation relevant to that claim. Although the Court finds that any lost billing invoices would be relevant as to this issue, adding more billing statements, even if they are relevant, is not likely to make or break that argument.

Although Plaintiffs were given the opportunity to present sufficient evidence at the hearing from which the Court could infer that the categories listed were in fact destroyed, Plaintiffs did not meet that burden with respect to the majority of those categories. Taking into account the original motion papers and massive exhibits included with them, the hearing testimony, and the post-hearing briefs, the Court finds that the great majority of what has been presented here does not go beyond the general description of the allegedly destroyed documents found to be insufficient in *In re Pfizer*, 2013 WL 76134, at 21, with the limited exception of the

---

[8] The Court has also considered the two affidavits submitted by Michael DiStefano in support of the motion for sanctions, along with the attached exhibits. *See* April 6, 2012 Affidavit of Michael DiStefano in Support of Motion For Sanctions (" DiStefano Aff."); May 15, 2012 Reply Affidavit of Michael DiStefano (" DiStefano Reply Aff."). Mr. DiStefano asserts that he personally maintained "a much more complete set of e- mails" between himself and the defendants and that many of the email correspondences he had with Defendant Katsos and her paralegals were not produced. DiStefano Aff. ¶¶ 6, 7. The majority of these emails consist of inquiries, updates and frustrations expressed by DiStefano to Katsos or one of the paralegals, with no corresponding responsive email from the Katsos law office. Much of the Distefano Reply Affidavit is directed to refuting by paragraph the May 2, 2012 Katsos Affidavit. There is no information in either affidavit which would cause the Court to contravene the analysis it has undertaken or the conclusions reached in this Memorandum and Order.

invoices and Plaintiffs' claim of conflict of interest.

The Second Circuit has made it clear that "relevant" in the "context of a spoliation motion 'means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence.'" *Curcio*, 283 F.R.D. at 112 (quoting *Residential Funding Corp*., 306 F. 3d at 108-09) (internal quotations omitted); *Best Payphones, Inc.,* 2016 WL 792396, at *5. As the Court pointed out in *Pension Committee*, "[i]t is not enough for the innocent party to show that the destroyed evidence would have been responsive to a document request. The innocent party must also show that the evidence would have been helpful in improving its claims or defenses–*i.e.*, that the innocent party is prejudiced without the evidence. Proof of relevance does not necessarily equal proof of prejudice." *Pension Committee*, 685 F. Supp. 2d at 467. With this principle in mind, the Court now turns to the issue of prejudice,

### C. Prejudice

"When evidence is destroyed willfully or through gross negligence, prejudice to the innocent party may be presumed because that party is 'deprived of what [the court] can assume would have been evidence relevant to [the innocent party's claims or defenses].'" *Sekisui*, 945 F. Supp. 2d at 504-505 (citing *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 148 (2d Cir. 2010) (affirming imposition of default judgment against defendants as discovery sanction where defendants willfully and in bad faith deleted relevant documents without requiring innocent party to prove prejudice)). When, however, the destruction of evidence is negligent, the burden falls on the innocent party to prove prejudice. *Id.* at 505 (citing *Byrnie,* 243 F.3d at 108). "This circuit has 'repeatedly held that a case-by-case approach to the failure to produce relevant evidence, at the discretion of the district court, is appropriate.'" *Id.* (quoting *Chin*, 685 F.3d at

162).

"The failure to adopt good preservation practices is 'one factor in the determination of whether discovery sanctions should issue.'" *Sekisui*, 945 F. Supp. 2d at 505 (quoting *Residential Funding Corp.,* 306 F.3d at 108). "No matter what level of culpability is found, any presumption is rebuttable and the spoliating party should have the opportunity to demonstrate that the innocent party has not been prejudiced by the absence of the missing information." *Pension Comm.*, 685 F. Supp. 2d at 468. Significantly, where the missing information has been obtained from other sources, courts have been reluctant to find that the moving party has suffered prejudice. *See Field Day, LLC v. County of Suffolk*, No. 04-2202, 2010 WL 1286622, at *14 (E.D.N.Y. Mar. 25, 2010) ("[I]t is unclear that Plaintiffs suffered any prejudice as destroyed documents apparently have been otherwise obtained.") (citing *Pension Comm.,* 685 F. Supp. 2d at 478 ("While many of these documents may be relevant, the Citco Defendants suffered no prejudice because all were eventually obtained from other sources.")). Finally, the "equities" of a case may not favor "a drastic remedy" such as an adverse inference instruction where "[t]here is no evidence of bad faith" on the part of the spoliating party. *SJS Distrib.*, 2013 WL 5596010, at *5.

Plaintiffs maintains that because the record shows that the relevant material was wilfully destroyed, they are under no obligation to prove prejudice. Under these circumstances, Plaintiffs argue that the Court should presume Plaintiffs have been prejudiced and should issue an adverse inference instruction. *Id.* The Court respectfully disagrees.

Because Katsos's culpability falls on the continuum between negligence and gross negligence, the Court declines to *presume* that Plaintiffs were prejudiced by any destruction of

ESI.  *See generally SJS Distrib.*, 2013 WL 5596010, at *5.  Rather, Plaintiffs must demonstrate

prejudice in order for the Court to consider imposing an extreme sanction such as an adverse

inference instruction.  *See, e.g.*, *Treppel*, 249 F.R.D. at 120 (adverse inference instruction is "an

extreme sanction and should not be imposed lightly").  Generally, the aggrieved party must

demonstrate through extrinsic evidence, such as other existing documents or deposition

testimony, that a reasonable jury could find that the missing ESI would have been favorable to

that party's claims.  *Curcio*, 283 F.R.D. at 113.  Plaintiffs have not met this burden.  Although

Plaintiffs have presented other documentation and affidavits as well as the hearing testimony

(even though neither side called Plaintiff DiStefano to testify at the hearing), they have not

established that any missing emails would have been favorable to their claims.  The record in this

case shows that not all electronically stored information was discarded or destroyed.  Here, some

emails were produced by the Defendants.  Others were obtained from Plaintiff DiStefano himself

based on steps taken to retrieve emails from his own computer.  The number of emails obtained

is not insubstantial.  The Court finds it somewhat puzzling that neither side attempted to

introduce any of the other emails actually produced originally by the Defendants nor the emails

contained in Defendants' supplemental production – other than the few put into evidence by the

Plaintiffs – during the evidentiary hearing.[9]  However, the Court has taken these emails into

account by virtue of its own study of the exhibits submitted with the original motion papers.

---

[9]      The Court notes that the emails admitted into evidence as PX 1– containing  discussions
between Katsos and Daigneault regarding Daigneault's complaints about Katsos' lack of timely
responses in an outside litigation –  does little to establish relevance or prejudice in the specific
circumstances of this case.

Although the Court has found some limited relevance in the invoices/billing records, the Court also points out that if the Plaintiffs are relying upon the content of the existing billing records as proof of or emblematic of critical information they think they would have obtained if all the billing records were intact, their expectations of obtaining such substantive information based on what can currently be seen in the existing ESI appears unrealistic and unwarranted. Although any missing billing records and transmittal emails may have aided the Plaintiffs in gaining additional information relevant to at least one of their malpractice claims, it cannot be said that the emails would have corroborated Plaintiffs' account of events or proven its claims against Katsos. *See SJS Distrib.*, 2013 WL 5596010, at *5.

Moreover, there is some indication that the missing information has been (or could be) obtained from other sources, which weighs against finding prejudice here. *Field Day v. County of Suffolk*, 2010 WL 1286622, at *14; *see SJS Distrib.*, 2013 WL 5596010, at *5 (adverse inference not warranted where "other evidence is still available to defendant") (citing *Golia v. Leslie Fay Co* ., No. 01 CV 1111, 2003 WL 21878788, at *10 (S.D.N.Y. Aug. 7, 2003) (finding that the spoliator's "misconduct has not robbed [the opposing party] of the only evidence on which they could base their case")).  There is no indication that either side attempted to depose Franco Treglia or even subpoenaed any documents or emails from him.  It also seems that no effort has been undertaken thus far to arrange a potential deposition of Jason Cirlante or any other non-party who may have knowledge, documents, or ESI regarding the underlying transactions on which Plaintiffs base their malpractice claims.  The Court notes that there are any number of third parties copied on the emails that have been produced whom the parties could have reached out to as well.  The Court likewise points out that discovery is still ongoing in this

case. Because Plaintiffs have not shown that a reasonable jury could find that the missing ESI would have been favorable to their claims, the Court finds that they have not established the degree of prejudice that is required in these specific circumstances. To the extent that there is any prejudice here, it is minimal.

### D.    Sanctions

Even where a court finds that a discovery failure does not result in prejudice, courts still maintain broad discretion in "crafting an appropriate sanction for spoliation." *West*, 167 F.3d at 779; *Fujitsu*, 247 F.3d at 436. The Court will not grant a default nor an adverse inference since Katsos' conduct, while negligent and troubling, was not malicious or in bad faith. *Learning Care Group, Inc.,* 315 F.R.D. at 441. However, Katsos is not exonerated and her actions (or lack of action) require accountability and necessitate a response. *Curcio*, 283 F.R.D. at 114.

Plaintiffs request attorneys' fees for this motion. A court "has discretion to award attorneys' fees and costs in connection with spoliation motions 'to punish the offending party for its actions and deter the litigant's conduct, sending the message that egregious conduct will not be tolerated.'" *Best Payphones*, 2016 WL 792396, at *7 (quoting *Field Day v. ,* 2010 WL 1286622, at *14. Although sanctions in the form of an adverse inference, striking of pleadings or entry of default are not appropriate here, an award of monetary sanctions for the amount of reasonable attorneys' fees and costs incurred in connection with this motion is warranted. *Field Day, LLC v. County of Suffolk*, 04 Civ. 2202,  2010 WL 5490990, at *1 (E.D.N.Y.  Dec. 30, 2010).   In this instance, Defendants will be required to pay the attorneys' fees and costs incurred by the Plaintiffs in making this motion based on Defendants' negligent conduct.  "This remedy ameliorates the economic prejudice imposed . . . and also serves as a deterrent to future

spoliation." *Cat 3*, 164 F. Supp. 3d at 502.

The Court further advises Plaintiffs' counsel that he is free to explore at trial the issue of records being discarded, without an adverse inference charge. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 138 F. Supp. 3d 352, 392 (S.D.N.Y. 2015) (citing *F.D.I.C. v. Horn*, 2015 WL 1529824, at *16 (counsel "free to explore at trial the issue of records being discarded, without an adverse inference charge, certainly during cross-examination or for impeachment purposes")).

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for spoliation is GRANTED, to the limited extent set forth in this Memorandum and Order, and is DENIED in all other respects.  Plaintiffs are awarded reasonable attorneys' fees and costs incurred in connection with the motion. Counsel shall confer to determine if they can come to an agreement as to the amount of attorneys' fees and costs to be paid.  If they are unable to do so, Plaintiffs shall submit a fee application, with supporting affidavit(s) and contemporaneous billing records on or before June 12, 2017.  Defendants may submit opposition by June 26, 2017.  No reply is permitted.

**SO ORDERED:**

Dated: Central Islip, New York
       May 10, 2017

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
United States Magistrate Judge